IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DEVONERE JOHNSON and NANU SULUREH,

                    Plaintiffs,

    v.

CITY OF MADISON, JOEL STELTER,
SHON F. BARNES, UNIDENTIFIED FEDERAL
AGENTS, MICHAEL GOODCHILD, DOMINIC
SCHROECKENTHALER, ANTHONY CIUFO,
CHRISTOPHER HALL, DEVLIN HERNKE,
JAVIER LOREDO, BENJAMIN SCHWARZ,
CHRISTOPHER DORNAN, LARS WILD, and
EMILY THOMPSON,[1]

                    Defendants.

**OPINION AND ORDER**
23-cv-441-wmc

---

Plaintiffs Devonere Johnson and Nanu Sulureh are representing themselves and proceeding on claims under the Fourth Amendment, the Equal Protection Clause, and state law against several Madison police officers for:  their alleged conduct during Johnson's arrest on August 19, 2022; the temporary seizure of both plaintiffs that same day; and the search of plaintiffs' residence the following year on June 14, 2023.  Plaintiffs also seek to hold the City of Madison and its former Police Chief Barnes (in his capacity as a supervisor and policymaker) liable under *Monell v. v. Dep't of Soc. Serv. of City of New York*, 436 U.S. 658 (1978), for the policies, practices, and customs allegedly leading to plaintiffs' detention, seizure and search of their home.[2]  Before the court are the parties' cross motions for summary judgment, including: (1) defendants' motion for summary judgment (dkt. #67) with respect to all of plaintiffs'

---

[1] The court has revised the caption to reflect the correct spelling of certain defendants' names.

[2] Because plaintiffs never identified the federal agents allegedly involved in these incidents, nor presented any evidence that federal officers were involved, those defendants will be dismissed without further discussion.

claims; and (2) plaintiff's motion for partial summary judgment (dkt. #86) with respect to their constitutional and *Monell* claims.  For reasons explained below, the court will grant defendants' motion, deny plaintiffs' motion, and decline to exercise supplemental jurisdiction over plaintiffs' remaining state-law claims for lack of subject matter jurisdiction.

UNDISPUTED FACTS[3]

### A. Parties

During all times relevant to this lawsuit, plaintiffs Devonere Johnson and Nanu Sulureh resided in apartment #201 at 714 Vera Court on the north side of Madison, Wisconsin, while the individual defendants were employees of the City of Madison Police Department.  Shon Barnes was the Chief of Police from February 2021 to February 2025; Michael Goodchild, Benjamin Schwarz, Javier Loredo, and Christopher Hall were all Madison police sergeants; and

---

[3] Unless otherwise indicated, the following facts are material and undisputed for purposes of summary judgment.  The court has drawn these facts from the parties' proposed findings of fact and responses, as well as from the record evidence, including where appropriate, the parties' declarations and the officers' squad car video and synchronized audio recordings from microphones worn by the officers.  While the court recounts facts in the light most favorable to plaintiffs, *McGee v. Parsano*, 55 F.4th 563, 566 (7th Cir. 2022), some key facts are established beyond reasonable doubt by video and audio recordings.  *See Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018) (at summary judgment, court must view the facts in the light most favorable to the nonmovant," but should "rely on clear and conclusive videos if they 'firmly settle a factual issue'") (citation omitted).  Additional facts relate to claims *not* allowed to proceed past screening; including: (1) an incident that took place on August 18, 2022 (the day before Johnson's arrest occurred) when he reported to Officer Casey Main (*not* a defendant) that three unidentified people had been harassing Sulureh (*id.*, ¶¶ 1-20); (2) plaintiffs' complaints to the Professional Standards and Internal Affairs ("PSIA") unit regarding defendants' conduct during the incidents in question (*id.*, ¶¶ 21-45, 97-110, 186-210, 267-73); and (3) defendants' failure to comply with Madison Police Department Code of Conduct or Standard Operating Procedures (*id.*, ¶¶ 14, 98, 101, 106, 111-25, 211-20, 249, 253, 262).  While the court does not recount in detail plaintiffs' proposed facts principally relating to these claims, it does address some of those facts in the body of the opinion in conjunction with plaintiffs' arguments that: (1) defendants took actions against plaintiffs on August 19, 2022, because of their race; and (2) the City of Madison had a pattern or practice of failing to train its police officers on reasonable searches and seizures, which led to the alleged violations in August 2022 and June 2023.

2

Joel Stelter, Christopher Dornan, Lars Wild, Emily Thompson, Devlin Hernke, Anthony Ciufo, and Dominic Schroeckenthaler were police officers.

### B. August 19, 2022 Incident

At approximately 10:00 a.m. on August 19, 2022, Officer Stelter was dispatched to 714 Vera Court in Madison, having been informed that Johnson was creating a disturbance, pacing, and acting erratically.[4] After arriving on scene, Officer Stelter waited for backup to arrive before engaging with anyone because he had previous professional encounters with Johnson dating back to protests that occurred in the summer of 2020. Officer Thompson was among those dispatched to the scene as back up for a disturbance. Johnson met the officers on the street in front of 714 Vera Court, carrying two small children. Officer Thompson then spoke with Johnson while Officer Stelter met with Samantha Green, the apartment building's case manager, who had called 911 to report the disturbance. During Stelter's conversation with Green, Thomson saw Johnson filming with his phone.[5]

Officers Dornan and Wild, as well as Sergeants Schwarz and Goodchild, were similarly dispatched with Thompson to provide back up, but none of them were at the scene for very long. Specifically, Officer Dornan arrived near the tail end of the call; Sergeant Schwarz was at the scene for only four minutes; Officer Wild appears to remain on scene as back up; and

---

[4] While Johnson attempts to dispute dispatch's characterization of his behavior by describing himself as "emotional" but "non-violent," his version of the events fail to create a genuine issue of material fact about what dispatch had *informed* Officer Stelter. (Johnson decl., dkt. #88, at ¶¶ 4-5.)

[5] The parties dispute whether Johnson was also yelling that the officers were targeting him.

3

there is no evidence establishing that Sergeant Goodchild ever made it to the scene.[6]  As for former Chief Barnes, he was not present at the scene at all, and none of the responding officers conferred with him during the incident or Johnson's subsequent arrest, which he neither approved nor disapproved.

None of the officers at the scene were equipped with body worn cameras.  Following Officer Stelter's investigation at the scene as described below, Johnson was arrested for disorderly conduct without an enhancement for domestic violence and transported to the Dane County Jail.  (*See* Stelter decl. (dkt. #69) and Case Rpt. (dkt. #69-1).)  However, because the District Attorney's Office declined to prosecute Johnson, no criminal case was ever commenced as a result of Johnson's arrest.

### C. 2022 Police Investigation

Much of what follows is taken not for the truth of the matter, but rather what information on plaintiff's conduct was related to the officers before making a decision to arrest.[7]

---

[6] Specifically, while Sergeant Goodchild was dispatched to back up Officer Thompson eight minutes before Johnson was placed in custody, he does "not believe that [he] ever made it to the scene of the incident" (dkt. #84, at ¶ 2), and plaintiffs do not present any evidence that he was at the scene.

[7] For example, plaintiffs attempt to dispute the veracity of Green's account to Officer Stelter in their declarations, averring that: (1) Johnson had previously called the police to seek help with racial harassment from neighbors and not to punish Sulureh; (2) the harassment caused significant fear and stress for their family; and (3) even though Johnson was crying and visibly distressed when Stelter arrived at the scene, he was not violent, threatening, or engaging in criminal or dangerous conduct.  (Johnson decl. (dkt. #88, at ¶¶ 1-6, 10); Sulureh decl. (dkt. #89, at ¶¶ 2-8).)  However, plaintiffs' statements about what transpired fail to create a genuine issue of material fact about what *Green reported* to Officer Stelter at the scene.  Regardless, plaintiffs concede that Green reported this version of events to Officer Stelter at the scene.

### 1. Interview of Green

During her conversation with Officer Stelter at the scene, the apartment manager, Green, reported that Johnson seemed to be experiencing increasing mental health issues over the course of the past month and that she had made several calls to the police in an attempt to get the Community Alternative Response Emergency Services ("CARES") team to deal with Sulureh, who was Johnson's live-in girlfriend and the mother of his three young children. When Green arrived at the building that day, she said Johnson was walking on his hands in front of the building, which alarmed her, because Johnson was not typically outside at this time of day. After entering her office, which is across the courtyard from Johnson's apartment, Green also reported hearing plaintiff yell from that apartment. Next, Green saw Johnson approaching her office and yelling that they needed to deal with the housing situation. Specifically, he reported that Johnson demanded Sulureh move out, and Green needed to "call the people," which Green understood as meaning the CARES team. When Green refused to call CARES about Sulureh, Johnson reportedly said that he saw who she was, she did not know who she was messing with, and he knew she was with "them."

After Johnson returned to his apartment, Green next reported hearing yelling and banging, after which she saw Johnson exit again into the courtyard area with his hoodie up and tightened around his face. Green said that Johnson proceeded to pace and yell various statements as he pointed down the road and to the apartments across the street, including: "Today is the day, bitch. I'm going to get a mother fucker today. Where you coward mother fuckers at? I'm going to kill you." Green also reported that after Johnson went back into the apartment, Sulureh came over to the office and asked for trash bags so she could move out, explaining that she could not deal with Johnson any longer.

After calling Domestic Abuse Intervention Services in an attempt to get some sort of temporary housing for Sulureh, Green walked over to the plaintiffs' apartment herself, where she could hear more yelling and a baby crying, and she observed plaintiffs' older children looking out the window.  Green then returned to her office to call her supervisor to ask what she should do next.  As Johnson came out of the apartment carrying the baby and approached Green's office door, he reportedly yelled that Green was after him and was working with "them."  At that point, Green said she felt personally threatened because Johnson made a further comment about "getting her" with a "scary, blank stare."  Finally, Green stated that after Johnson went back into his apartment, it went "dead silent," only for Johnson to emerge a short time later, carrying his son and daughter as the police arrived.

### 2. Interview of Sulureh

After Stelter finished interviewing Green, he went to talk directly with Sulureh, who reported that Johnson told her to "just move out" during an argument, prompting her to go to Green's office for some garbage bags for her belongings.  Sulureh also told Green that she was willing to sign papers to be taken off the lease.  Sulureh further stated that after returning to the apartment, Johnson left and had some kind of argument with Green before the police arrived.  However, since someone had heard yelling and banging, Officer Stelter told her that he believed more had happened.  Sulureh then admitted Johnson and she had yelled and swore at one another, but that it was just an argument while she was packing.  Sulureh denied feeling threatened or afraid and stated that she just needed to separate from Johnson while she prepared to move out.

### 3. Interview of Johnson

After finishing his interview with Sulureh, Officer Stelter spoke with Johnson, who told him that several people had been harassing them, including one person who told Sulureh to "go back to Africa." Johnson said that the situation was very difficult and brought a lot of stress and irritation into their home. Johnson also said that he just wanted some support from Green, as well as for other people to leave them alone and stop making Sulureh "freak out." Johnson denied that there had been any yelling inside of the apartment. In fact, Johnson claimed that he had previously called police about *Sulureh*, because he loved her and she was having a difficult time. When he talked about Sulureh, Johnson also cried several times during this interview.

### 4. Johnson's Arrest

Pursuant to his training and experience as a Madison police officer, Stelter reported then considering whether mental health concerns merited a disposition other than arresting Johnson. As part of his investigation at the scene, therefore, Stelter called Journey Mental Health and consulted with Alex Berthelon, a counselor, who told Stelter that based on what he learned from witnesses, the situation did not meet the requisite level of danger to proceed with an emergency mental health detention.

Officer Stelter also conferred with Sergeant Schwarz, explaining the information he gathered at the scene and discussing whether probable cause existed for charges of disorderly conduct based on Johnson's reported behaviors, particularly by Green. Sergeant Schwarz agreed that a charge of disorderly conduct was an appropriate disposition based on Johnson's reported interactions with Green.

Officer Stelter then signaled for Officer Dornan to come over to stand by while Stelter was putting Johnson into handcuffs.  Johnson then stood up and put his hands behind his back while Stelter placed him into handcuffs, which he checked for fit and double-locked.  Johnson did not resist.  However, Johnson claims that despite his cooperative behavior, the officers surrounded him with firearms drawn while Officer Stelter grabbed him by the arm, twisted his wrist and forearm, and forcibly pulled his other arm behind his back, causing him pain.  (Dkt. #88, at ¶¶ 6-7.)  According to Johnson, his "wrists were contorted inward, [his] arms were torqued unnaturally, and [he] felt sharp pressure driven into my shoulders as he applied handcuffs tightly around both wrists."  (*Id*. at ¶ 7.)  Johnson further states the "handcuffs were placed in a manner that caused throbbing pain, loss of circulation, and indentation marks, which remained after removal," and his "shoulders remained tender and inflamed following the encounter."  (*Id*. at ¶ 8.)

No other officer at the scene used any force against Johnson.  Once Johnson was in handcuffs, Officer Stelter walked Johnson over to his squad car and placed him into the back seat.  According to Johnson, "Officer Stelter dug his hand into [Johnson's] shoulder and collarbone area, squeezing and applying pressure while marching [Johnson] toward [the] squad car."  (Dkt. #91, at ¶ 11.)

## D. Johnson's 2022 Detention in Squad Car and Transport to Jail

Officer Stelter's squad car was equipped with an in-car video system called "Arbitrator," which activated while Johnson was in the car.  The video begins at 11:29 a.m., with Johnson sitting in the back seat of the squad in handcuffs, then continues with Officers Dornan and Thompson having brief verbal interactions with Johnson.  The front facing camera shows:

Officers Dornan and Wild talking outside of the squad car, then driving away around 11:33 a.m.; and Sergeant Schwarz speaking with Officer Stelter in front of the car for a few minutes at 11:36 a.m.

At approximately 11:49 a.m., Officer Stelter got into the squad car and explained to Johnson that he was being charged for disorderly conduct, but not with a domestic enhancer. Johnson promptly responded, "That's fair, that's fair, … my bad."  Both Johnson and Stelter appear calm.  At approximately 12:00 p.m., Officer Stelter began driving Johnson to the Dane County Jail.  The parties do not dispute that the available video shows that Johnson remained calm and expressed no complaints for the duration of his time in the squad car.

After Officer Stelter arrived at the Dane County Jail with Johnson in handcuffs, he directed Johnson to step out of the car.  Officer Thompson then walked Johnson over to a booking area in the sally port to complete paperwork.  Officer Stelter followed, carrying Johnson's shoes and phone.  Because Officer Stelter noticed that Johnson had slipped his handcuffs from the back to the front as he sat down on a chair in the booking area, he told Johnson that the deputy who would be coming out to meet them would probably want Johnson to be cuffed behind his back again.  Johnson then cooperated by standing up and shifting the cuffs to his back again.  Moreover, Johnson appeared to have no visible, physical trouble completing either maneuver, whether shifting the cuffs from his back to his front when he first sat down or shifting them back behind him again before being removed.[8]  In fact, Officer

---

[8] While plaintiffs concede that the Arbitrator video footage depicts Johnson not having any problem shifting his handcuffed wrists from back to front, then to the back again, plaintiffs cite Johnson's declaration as support for their contention that he repositioned the handcuffs in the first place because the cuffs were causing him physical discomfort when secured behind his back.  However, Johnson's actual declaration fails to support that contention.

Stelter's Arbitrator video shows that Johnson was cooperative and expressed no complaints after exiting the car at the jail.

While the Madison Police Department referred Johnson to jail on August 22, 2022, for a single count of disorderly conduct under Wis. Stat. § 947.01, Assistant District Attorney Will Davis confirmed in writing to Johnson that *no* prosecution was going to be commenced based on the August 19 incident, having concluded that the charge "lacked prosecutorial merit." More specifically, although Davis reported in the intake return form that there was probable cause for disorderly conduct, Johnson's actions appeared to be solely verbal, consisting of "bizarre, vague threats to no one in particular," which would be best addressed by community treatment providers, rather than the criminal justice system.  (Dkt. #93-2, at 1.)

### E.  June 14, 2023 Incident

Almost one year later on June 14, 2023, at approximately 7:36 p.m., Madison Police Officer Ciufo heard information being aired by dispatch that a caller who lived at 714 Vera Court in Madison was reporting that a black male wearing no shirt and black jogging pants had flashed a gun at her after the caller's child squirted his child with a water gun.  When alert tones aired, signaling that the call for service involved a report of weapons, Officer Ciufo answered the call and requested a tactical channel and a dispatcher given the potential danger. Sergeant Loredo and his trainee, Sergeant Hall, heard the same dispatch information and alert tones, then proceeded to the scene in keeping with standard protocol calling for a sergeant to be dispatched as a supervisor for alert-tone calls.

Because Officer Ciufo was the first officer to arrive on scene at 7:39 p.m., he was designated as the primary officer for the call.  His squad car was equipped with the Arbitrator

video system, which recorded what was in view of the forward-facing camera. In addition, the microphone on Officer Ciufo's person was synchronized with the Arbitrator system, recording audio of his interactions at the scene to the extent Ciufo was within a certain range of his squad car.

While waiting in his squad car for additional officers to arrive, Officer Ciufo and Sergeant Loredo discussed having two officers at the front and one officer at the back of the building. Soon after, Officer Benjamin Cripe (not a defendant) arrived, and Officers Ciufo and Cripe went to the front of 820 Vera Court, an address near plaintiffs' apartment, to assess the overall scene. According to Sergeant Hall, the address of the incident was in the midst of several apartment buildings with multiple surrounding units. Officer Ciufo's Arbitrator video footage shows one of the officers carrying a rifle at his side. At approximately 7:41 p.m., Ciufo is heard advising Sergeants Loredo and Hall that there are some "kiddos" around the building. They next ask the children to: "Go inside, please, can you go inside? Just go inside for me. Thank you."

### F. Plaintiffs' Subsequent Detention

At approximately, 7:42 p.m., Officer Ciufo observed a black male, later identified as Johnson, wearing no shirt and black sweatpants, standing in front of the apartment building while talking on the phone.[9] Dispatch told Ciufo that the caller was wearing black sweatpants and no shirt and that the caller could see police, prompting Ciufo to wave Johnson over to them. Ciufo could see that Johnson had nothing in his front waistband and appeared to be compliant, as he had his other hand over his head and open, showing Ciufo he had no weapon.

---

[9] It was later discovered that Johnson had called 911 and was on the phone with dispatch.

Ciufo can be heard on his Arbitrator recording from approximately 7:42 to 7:44 p.m., repeatedly asking Johnson to come to him. As Johnson approached Officers Ciufo and Cripe, he also volunteered that nobody had a gun.

During this time, the person who had called 911 to report a gun having been flashed at her, Malajsia Birchette, was outside and stated that the male who was in the black sweatpants (Johnson) was the person who allegedly flashed a gun at her after a verbal argument. In fact, beginning at approximately 7:44 p.m. on Officer Ciufo's Arbitrator audio recording, Birchette can be heard telling the officer that she thought Johnson put the gun in a book bag; and when Officer Ciufo asked her where the gun was now, Birchette told Ciufo that she thought Johnson put it in his apartment. Officer Ciufo shared this information with Sergeants Loredo and Hall as they drove up to the scene.

When Officer Schroeckenthaler arrived, he also approached Ciufo, who along with Officer Cripe, were already talking with plaintiffs Johnson and Sulureh outside the apartment building. Officer Ciufo directed Officer Schroeckenthaler to stand by with Johnson, who unbeknownst to Schroeckenthaler was still on his phone with dispatch. Like Ciufo, Officer Schroeckenthaler was generally aware of Johnson based on previous professional contacts as a patrol officer working out of the North District. Schroeckenthaler next frisked Johnson for weapons, but did not locate any. He also instructed Johnson to tell the person he was talking with that he was with the police, then hang up.

Both Officers Ciufo and Schroechenthaler recognized Johnson as the male with whom Ciufo was talking and to whom Birchette was referring. At approximately 7:45 p.m., Ciufo advised Johnson and Sulureh that they were being detained because there had been reports of a gun. At Officer Ciufo's instruction, Officer Schroeckenthaler informed Johnson he was being

12

detained, placed Johnson's hands behind his back and in handcuffs, checked the handcuffs for fit and double locked them for safety, and told Johnson to sit on the ground.  Sulureh was also detained in handcuffs and directed to sit near Johnson.[10]

Hearing the alert tones and dispatch information about a possible weapon, Officer Hernke also arrived on scene at approximately 7:45 p.m.  Shortly after he got out of his squad car, Hernke can be heard on his Arbitrator recording asking several, nearby community members whether anyone saw a gun.  These bystanders told Officer Hernke that the male (Johnson) and his fiancé (Sulureh) had been involved only in a verbal altercation with another woman, and specifically denied that any gun or weapon was displayed or used at any time during the incident.  Still, none of the community members were willing to identify themselves or provide their names to confirm their statements.   Hernke then joined Officer Schroeckenthaler, Johnson, and Sulureh at approximately 7:48 p.m.  During the next few minutes, Hemke explained that a disturbance was reported in which a person matching Johnson's description had flashed a gun, so police were trying to investigate.  Sergeants Loredo and Hall arrived at the scene sometime between 7:46 p.m. and 7:54 p.m., after Johnson and Sulureh had been detained.

---

[10] There is some dispute about whether Johnson was detained in handcuffs before or after Sulureh appeared on scene.  Officer Ciufo states that Sulureh was present and speaking with them before Johnson was detained.  (Dkt. #76, ¶ 14.)   However, Johnson maintains that the officers immediately detained him, searched him, placed him in handcuffs, and only spoke to him after they sat him down in the grass, during which time Sulureh pulled up in her car.  (Dkt. #88, at ¶¶ 5-6.) For her part, Sulureh claims that she returned from grocery shopping to see police cars surrounding her home and Johnson already handcuffed and on the ground.  (Dkt. #89, at ¶¶ 6 and 8.)  However, this dispute is not material as the parties agree Sulureh was detained and placed in handcuffs shortly after her arrival at the scene.

## G. Search of Plaintiffs' Apartment and Car

Meanwhile Officers Ciufo and Cripe went into the common area of the apartment building. Officer Ciufo then instructed Birchette to go into her apartment (number 202), which was across the hall from Johnson and Sulureh's apartment (number 201). Officers Ciufo and Cripe then stood by at the door to Johnson and Sulureh's apartment, while Sergeants Loredo and Hall arrived with a ballistic shield from their squad car. Having learned from Officer Schroeckenthaler that Johnson and Sulureh reported their three children between the ages of one and eight were in the apartment, Ciufo directed Officer Schroeckenthaler to ask Johnson and Sulureh if they would consent to officers entering their apartment to check on their children's welfare.

Specifically, at approximately 7:49:19 p.m. on Schroeckenthaler's Arbitrator recording, he can be heard asking plaintiffs the age of the children inside their apartment; then at 7:51 p.m., Officer Schroeckenthaler initiated a discussion with plaintiffs about granting their consent for the officers to enter their apartment. At the time of this discussion, Johnson and Sulureh were handcuffed, detained outside, and surrounded by multiple armed officers. Initially refusing consent for the officers to enter the apartment, even to check on the children, Johnson can be heard on the recording at approximately 7:52:20 p.m., suggesting that Sulureh and he could go into the apartment by themselves without handcuffs. A second later, starting at approximately 7:52:21 p.m., Sulureh offers "you can search the whole damn apartment when we're in there with our kids; when I'm with my babies go right ahead." While Johnson cannot be heard raising any further objections to a search or contradicting Sulureh's statement, Johnson maintains that he never gave consent for the officers to enter the apartment, and he argues that Sulureh only did so after the officers pressured her into it.

14

As Officer Schroeckenthaler remained outside with Johnson, Officer Hernke escorted Sulureh inside to the apartment door, where the other officers were already waiting to enter. While the parties dispute who actually unlocked the apartment door -- an officer or Sulureh herself -- Sergeant Loredo and Officers Hernke, Ciufo, and Cripe entered the apartment at 7:54 p.m. with Sulureh.  The officers performed a protective sweep to locate the children and confirm that no other adults were in the apartment and no firearm was in plain sight.  At approximately 7:54:46 p.m., Officer Ciufo can then be heard on his Arbitrator recording asking the children, but not yelling at them, to go into the bathroom and saying "thank you." According to Ciufo, the officers proceeded to search for places in the apartment where a person could be hiding, as well as lifting closed bags to feel their weight in order to determine if a firearm could be contained in the bag, but they did not open or search the bags themselves. According to all of the officers present, none pointed a gun at anyone during their entry or search.[11]

---

[11] While plaintiffs cite their own declarations in support of the contention that some officers yelled loudly and pointed firearms at the children as they entered the apartment, then searched all of the personal spaces in their home, Johnson was *not* present and could not have witnessed this alleged behavior.  As for Sulureh, she actually states, without any explanation, "I *later learned* that officers entered the home with guns drawn, searched bedrooms and private spaces, and ordered my children into the bathroom," suggesting that she also lacked personal knowledge of the officers' alleged behavior at the time it occurred.  (Dkt. #89, at ¶ 10 (emphasis added)).  Rather, both plaintiffs appear to base their contention on a statement from their oldest child, G.G.J., who reported seeing "police officers holding guns, in tactical gear, with bright flashlights pointed toward him and into the apartment" and hearing the officers "yell loudly" to "[g]et in the bathroom now!" (G.G.J. Decl., dkt. #90.)  However, G.G.J. does not describe the search performed by the officers.  It is questionable whether a 10-year-old child is a reliable reporter, especially to events occurring two years before.  Regardless, the declaration, which is clearly prepared and signed by Johnson, does not describe guns being pointed at G.G.J. or his siblings.  Moreover, the alleged conduct relates only to plaintiffs' children, not plaintiffs themselves, and plaintiffs cannot bring a claim on behalf of their children without an attorney. *Lawrence v. Sec'y of State*, 467 F. App'x 523, 525 (7th Cir. 2012) ("pro se plaintiffs cannot represent others"); *Tuttle v. Illinois Dep't of Children & Family Servs.*, 7 F.3d 238 (7th Cir. 1993) ("Although a parent has a right to litigate claims on his own behalf without an attorney, he cannot litigate the claims of his children unless he obtains counsel.").

Within about a minute of the officers' entry into the apartment, Sergeant Loredo notified dispatch, "10-2 INSIDE APT 201 – 1230," meaning things were clear.  Officer Hernke then removed Sulureh's handcuffs, so she could hold her youngest child.[12]  However, to ensure that no gun was present, the officers searched the couch before Sulureh sat on it.  At approximately 7:59 p.m., Officer Hernke returned to where Officer Schroeckenthaler and Johnson were located outside, telling them that "[e]verything is 10-2 upstairs, she's out of cuffs and with kiddo."  (Dkt. #75, ¶ 19.)  Officer Hernke then removed Johnson's handcuffs at approximately 8:00 p.m.

After determining that the apartment was safe, Officer Ciufo went into the hallway at approximately 7:58 p.m. to talk with Birchette, who explained in more detail her interaction with Johnson outside the apartment building, including that Johnson had reached into a black, duffle-style gym bag and grabbed what she believed to be a handgun and stated something to the effect of "I'm ready for whatever."  As a result, Birchette stated she felt "scared as hell" and believed she was going to be shot, prompting her call to 911.  Birchette also told Ciufo that she saw Johnson hand his girlfriend (Sulureh) the bag, which she then put in their black Dodge SUV with tinted windows.  When Officer Ciufo returned to talk with Sulureh to investigate Birchette's allegation regarding the bag with a gun in it, as can be heard on Ciufo's recording at 8:09:50 p.m., Sulureh told him that her vehicle was outside and that he could go search it.  She then accompanied Ciufo and was present when he conducted a brief, three-minute search of the SUV, which revealed no bag or gun.

---

[12] Plaintiffs attempt to dispute this fact by contending that Sulureh remained in handcuffs until after the officers searched her vehicle, which occurred after the search of the apartment.  However, their declarations (dkt. ##88-89), which they cite in support of this contention, do not state when Sulureh's handcuffs were removed.

By approximately 8:13 p.m., therefore, Sergeant Loredo was satisfied that no basis existed to detain either Johnson or Sulureh any longer, so they were released from any further detention, and police wrapped up the investigation without making any arrests. Before police cleared the scene, at approximately 8:15 p.m., Sergeants Loredo and Hall also met with Johnson and Sulureh in front of the apartment building, along with other officers who had responded. In response to Johnson's and Sulureh's questioning why they had been handcuffed, Sergeant Loredo explained that the responding officers needed to make sure that everyone was safe and determine whether anyone had a gun. Johnson and Sulureh expressed their frustration that their neighbor (Birchette) had falsely reported the flashing of a gun and wanted to know whether the neighbor could be arrested. However, Sergeant Loredo explained his belief that the officers were faced with a "he said / she said" situation.

OPINION

Summary judgment is appropriate if the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-407 (7th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). In deciding whether to grant summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255.

Generally, a court construes the filings of unrepresented parties, like plaintiffs in this case, generously. *See Anderson v. Hardman*, 241 F.3d 544, 545 (7th Cir. 2001) (noting that

17

courts "construe pro se filings liberally").  However, the Seventh Circuit has repeatedly referred to summary judgment as the "put up or shut up" moment for parties seeking to take their claims to trial, even for pro se litigants. *Johnson v. Cambridge Indus. Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (citation omitted).  Accordingly, plaintiffs here must "do more than simply show that there is some metaphysical doubt as to the material facts"; they must respond to defendants' showing of a lack of material disputes of fact by designating specific facts in affidavits, depositions, answers to interrogatories or admissions that establish a genuine, triable issue.  *Anderson*, 477 U.S. at 256-57, 261.  Because evidence proffered by both sides must also be admissible at trial, neither side may rely on inadmissible hearsay, speculation, or conclusory allegations to defeat summary judgment.  *See Prude v. Meli*, 76 F.4th 648, 661 (7th Cir. 2023); *Gorbitz v. Corvilla, Inc.*, 196 F.3d 879, 882 (7th Cir. 1999).  Finally, a factual dispute can preclude summary judgment only if the facts "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

Plaintiffs argue defendants' documents create no genuine dispute of material fact that: (1) defendants Barnes, Stelter, Thompson, Dornan, Wild, Goodchild, and Schwarz violated Johnson's rights under the Fourth Amendment and the Equal Protection Clause on August 19, 2022; (2) defendants Barnes, Ciufo, Loredo, Hall, Hernke, and Schroeckenthaler violated Johnson's and Sulureh's Fourth Amendment rights on June 14, 2023; and (3) defendants City of Madison and Barnes in his official capacity are liable for these violations under *Monell*.  On the other hand, defendants contend that they are all entitled to summary judgment because: (1) plaintiffs lack evidence sufficient to establish any constitutional violation during either the 2022 or 2023 incident; (2) even if a violation could be found, the individual defendants are entitled to qualified immunity for their actions because no arguable statutory or constitutional

18

violation had been clearly established under federal law before each incident; and (3) plaintiffs lack sufficient evidence to prove their remaining *Monell* and state-law claims.

To prevail at the summary judgment stage on defendants' assertion of the affirmative defense of qualified immunity, plaintiffs must show that a defendant violated "clearly established statutory or constitutional rights." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011); *Gupta v. Melloh*, 19 F.4th 990, 1000 (7th Cir. 2021). In particular, to be clearly established, the right must be "sufficiently clear that every reasonable official would understand that what he is doing violates that right." *Schimandle v. Dekalb Cnty. Sheriff's Off.*, 114 F.4th 648, 655 (7th Cir. 2024). Moreover, the United States Supreme Court has frequently cautioned against defining a right at too high a level of generality to avoid rendering the defense of qualified immunity relatively meaningless. *Mullenix v. Luna*, 577 U.S. 7, 12 (2015). Finally, the Supreme Court has emphasized the importance of applying qualified immunity correctly in excessive force cases, an area of the law "in which the result depends very much on the facts of each case." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam); *see also City of Tahlequah, Oklahoma v. Bond*, 595 U.S. 9, 12 (2021) (per curiam) ("[I]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.") (citation and quotation marks omitted). Indeed, "[w]hen properly applied, it protects all but the plainly incompetent or those who knowingly violate the law." *al-Kidd*, 563 U.S. at 743.

Keeping these standards in mind, the court will start by discussing plaintiffs' claims against the City of Madison and Chief Barnes in his individual capacity, then separately address plaintiffs' constitutional claims with respect to each incident, before finally turning to plaintiffs' *Monell* and state-law claims.

19

## I.  City of Madison and Police Chief Barnes

As an initial matter, the court must dismiss plaintiffs' claims that former Chief Barnes turned a blind eye to the conduct of the responding officers on August 19, 2022, and June 14, 2023.  First, it is undisputed that Barnes was not present at the scene of either incident, was not consulted by any officers at either scene, and neither approved nor disapproved the officers' actions during either incident.  *See Gonzalez v. McHenry Cnty., Ill.*, 40 F.4th 824, 828 (7th Cir. 2022) (Section 1983 lawsuits "require personal involvement in the alleged constitutional deprivation to support a viable claim.").  Second, plaintiffs argue that Chief Barnes was ultimately responsible for supervising all of the officers in the Madison Police Department, as well as developing and enforcing the policies that they claim led to the alleged constitutional violations.  However, supervisors are not automatically liable under § 1983 for violations committed by their employees, unless plaintiffs have proof from which a reasonable jury could find that the supervisor knew about the unconstitutional conduct or policy and facilitated, approved, or condoned it, none of which plaintiffs have proven here.  *Matthews v. City of East St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012).  Further, to the extent plaintiffs are arguing that policies of the City of Madison, which Barnes allegedly created and/or enforced, are relevant under *Monell,* those arguments also fail.

Under *Monell*, a municipality may be held liable under § 1983 for constitutional violations caused by the municipality itself through its own policy or custom.  436 U.S. at 694.  Here, plaintiffs claim that defendants City of Madison and former Chief Barnes, in his capacity as a supervisor and policymaker, had a policy, custom and/or practice of failing to train and supervise police officers as to reasonable searches and seizures and the proper use of force, even though they knew that: (1) this practice had led and would lead to constitutional violations;

and (2) other measures -- such as the use of BWCs -- would prevent or stop such violations. While "a municipality may be directly liable for constitutional violations by its officers when the municipality evinces a deliberate indifference to the rights of the plaintiff by failing to train adequately its officers to prevent the violation, there can be no liability under *Monell* for failure to train when there has been no violation of the plaintiff[s'] constitutional rights." *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007).  Because plaintiffs have failed to prove that any of the individual defendants violated plaintiffs' constitutional rights in conjunction with the August 2022 and June 2023 incidents, as set forth below, it follows that the City and Chief Barnes cannot be held liable under *Monell* for any failure to train.  *Reynolds v. Shelton*, No. 24-1363, 2024 WL 4524123, at *4 (7th Cir. Oct. 18, 2024) (finding same).

Plus, even if a violation had occurred, plaintiffs have wholly failed to present any *evidence* of deficiencies in the City's training for which it or Chief Barnes in his official capacity could be held liable.  Plaintiffs contend that past citizen complaints, including their own, about Madison police officers "would permit a reasonable jury to find that MPD leadership knew that unrecorded armed encounters [and] consent disputes [could solely be] resolved … through officer declarations, supervisory presence without intervention, and the failure to preserve acknowledged surveillance evidence created a recurring and obvious risk of Fourth Amendment violations—and nonetheless chose to maintain those conditions." (Dkt. #94, at 69.)  However, they again fail to propose specific facts supported by affidavits, depositions, or other admissible evidence that establish a genuine factual dispute regarding (1) the existence of other incidents of alleged misconduct or the use of BWCs, inadequate supervision, or other policies, *or* (2) the likely use of BWCs in the two incidences at issue would have made any material difference in

resolving the factual disputes, much less have prevented the alleged violations of federal statutory or constitutional law.

Instead, plaintiffs rely inappropriately on speculation and conclusory allegations, which are insufficient to defeat summary judgment. *Anderson*, 477 U.S. at 256-57, 261; *Prude*, 76 F.4th at 661. For example, plaintiffs argue that the City and its policymakers chose not to equip officers with BWCs, knowing that there would be no objective record of their officers' behavior in "high-risk" and "constitutionally-sensitive" encounters with citizens. (Dkt. #94, at 71-72.) Plaintiffs also seem to suggest that the City's failure to provide officers with BWCs deprives them and other citizens of an important evidentiary tool in resolving disputes regarding excessive force and consent to search (dkt. #94, at 69), but without evidence of bad faith on the part of police, which plaintiffs have failed to show in this case, failure to preserve potentially useful evidence does not constitute a constitutional violation. *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) (discussing failure to preserve exculpatory evidence in context of due process clause).

Regardless, defendants have offered ample evidence, which plaintiffs have failed to dispute, that the City had been studying and debating a more widespread use of BWCs since at least 2020, including creating a committee to evaluate the issue. Specifically, in the summer of 2020, the Common Council and Mayor created a committee known as "the Body-Worn Camera Feasibility Review Committee." Very shortly before Shon Barnes became the Chief of Police, that committee issued a comprehensive report on January 26, 2021, which Chief Barnes reviewed as part of his regular duties when he took office in February of 2021. However, the City of Madison continued to study and debate the issue of implementing a program to equip all officers with BWCs for several more years.

22

In particular, the 2021 committee report sets forth the history of the debate over BWCs in Madison, including a detailed recitation of the concerns, points, and counterpoints raised by various constituencies. In part, the report also concluded that "BWCs are not a panacea, and cannot alone be expected to 'fix,' or necessarily even improve, the perceived problems with policing and police/community relations, over-policing, or excessive uses of force. Indeed, it is possible that they might cause more unintended negative consequence than benefits." (Dkt. #70-1, at 7.) According to Chief Barnes, evaluating the possible use of BWCs by all officers was one of his priorities, and as part of that effort, he requested approval from the Madison City Council to conduct a BWC pilot program, which the Council authorized in August 2023.

Thus, while on both August 19, 2022, and June 14, 2023, when each of the incidents took place here, MPD had only a limited number of body worn cameras ("BWCs"), which were available primarily for use by motorcycle patrol officers and members of the Special Weapons and Tactics ("SWAT") team. Later, under Chief Barnes' leadership, 41 patrol officers and sergeants in the North District were equipped with BWCs from April 14 to July 14, 2024, and an outside researcher has since collected additional data and posed survey questions. At the conclusion of this BWC pilot program, Barnes submitted a report dated November 15, 2024, to the Mayor and City Council, detailing the following findings: officers did not change behavior while wearing a BWC; charges were not added when officers reviewed video; technical issues related to battery life and uploading video were evident in the first half of the experiment but then resolved; other limitations of the experiment included a short duration, the small number of officers who participated, a limited period for analysis, and no post-experiment analysis; specific situational use of BWCs required additional clarification of the standard operating procedure; BWCs may help with trust building, legitimacy, and transparency; and

23

public record requests required staff time to research, redact, and provide videos to requestors. (Dkt. #70-2, at 2-3, 13-14.) Ultimately, Chief Barnes' personal opinion was that the benefits of BWCs outweighed the costs, so from the conclusion of the pilot program until the time he left city employment, he worked with the City Council and the Mayor's office to identify funding opportunities to allow for its full deployment.

As defendants point out, the fact that failing to require BWCs *might* lead to police misconduct "is hardly sufficient to satisfy *Monell*'s requirement that the particular policy be the 'moving force' behind a constitutional violation. There must at least be an affirmative link between the training inadequacies alleged, and the particular constitutional violation at issue." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824 n.8 (1985) (plurality opinion); *see also Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 307 (7th Cir. 2010) ("Nothing occurs in a vacuum, and we have no doubt that additional factors [such as better training and less overcrowding], other than the officers' malfeasance, may be at play. . . All of this may be true, but it does not satisfy the causation requirement here."). In fact, it is undisputed that the BWC pilot program, which Chief Barnes instituted in 2024, revealed that officers actually *did not* change their behavior while wearing a BWC. Without any contradictory, admissible evidence, plaintiffs cannot establish that a lack of BWCs was a contributing factor in defendants' alleged Fourth Amendment violations in this case. For all of these reasons, defendants City of Madison and Barnes are entitled to summary judgment as to plaintiffs' *Monell* claim.

## II. August 19, 2022 Incident

With respect to Johnson's arrest and detention on August 19, 2022, plaintiffs argue that a reasonable jury could find on this record that defendants Stelter, Goodchild, Schwarz,

Dornan, Wild, and Thompson violated the Fourth Amendment because they did not have probable cause to arrest Johnson for disorderly conduct, used excessive force when placing him in handcuffs and escorting him to the squad car, and later wrote a false police report about the incident, which resulted in his malicious prosecution.[13]  Plaintiffs also assert that defendants took these actions because of Johnson's race in violation of the Equal Protection Clause.  For their part, defendants argue that: (1) there was at least arguable probable cause for purposes of qualified immunity to arrest Johnson for disorderly conduct, which bars any claim that Johnson was unreasonably seized, falsely arrested, or maliciously prosecuted; (2) Johnson's arrest did not lead to any criminal proceedings; (3) no defendant used excessive force or was even aware that Johnson experienced pain when Stelter secured him in handcuffs and escorted him to the squad car; and (4) there is *no* evidence that any of the defendants' actions were racially motivated.  The court addresses each argument in turn.

### A.  Unlawful Arrest

"An unlawful arrest occurs when a person is seized by police without probable cause." *Hardrick v. City of Bolingbrook*, 522 F.3d 758, 762 (7th Cir. 2008) (citations omitted); *see also Gonzalez v. Vill. of W. Milwaukee*, 671 F.3d 649, 655 (7th Cir. 2012) ("False arrest is shorthand for an unreasonable seizure prohibited by the Fourth Amendment.").  Probable cause to arrest exists if a reasonable officer with the same knowledge as the arresting officer would have believed that the arrestee had committed a crime as defined under the laws of the applicable state.  *See Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979); *Hawkins v. Mitchell*, 756 F.3d 983,

---

[13] Plaintiffs' claims arising from the August 19, 2022 incident are limited to Johnson as plaintiffs have not argued or presented any evidence from which a reasonable jury could find that any defendant seized or detained Sulureh during that incidence, much less violated her rights, on that day.

994 (7th Cir. 2014).  This means that police officers need more than a mere suspicion to have probable cause to arrest.  *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 714 (7th Cir. 2013).  "Determining whether an officer had probable cause to arrest entails a purely objective inquiry; the officer's subjective state of mind and beliefs are irrelevant."  *Id.*; *see also Thompson v. Wagner*, 319 F.3d 931, 934 (7th Cir. 2003) (probable cause determined by facts and circumstances within officer's knowledge at time of the arrest).  Accordingly, this court must "examine the events leading up to the arrest," then determine "'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause."  *United States v. Eymann*, 962 F.3d 273, 287 (7th Cir. 2020) (citing *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)).

In this case, Johnson's arrest comports with the Fourth Amendment if the information known to Officer Stelter when he made the arrest provided a reasonable, objective officer with probable cause to arrest Johnson for disorderly conduct.  *United States v. Hill*, 818 F.3d 289, 294 (7th Cir. 2016); *Fox v. Hayes*, 600 F.3d 819, 837 (7th Cir. 2010).  As defendants point out here, the fact that Johnson was never charged or convicted of the offense does not mean that there was no probable cause at the time of his arrest.  *Matthews v. City of E. St. Louis*, 675 F.3d 703, 706-07 (7th Cir. 2012) (evidence supporting determination of probable cause need not be enough to support a conviction or even enough to show that officer's belief is more likely true than false).  Moreover, the question of whether there was "probable cause to arrest [plaintiff] is separate from the question relating to qualified immunity."  *Schimandle*, 114 F.4th at 654 (quoting *Fleming v. Livingston Cnty.*, 674 F.3d 874, 879 (7th Cir. 2012)).

Still, a district court may choose to resolve a claim on qualified immunity grounds without addressing the underlying constitutional violation.  *Id*. at 654-55.  As to this question,

26

an officer is entitled to qualified immunity in a false arrest case when "a reasonable officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed *in the light of well-established law.*" *Id*. at 656 (emphasis added); *see also Payne v. Pauley*, 337 F.3d 767, 776 (7th Cir. 2003) (citing *Kelley v. Myler*, 149 F.3d 641, 646 (7th Cir. 1998)) (The standard "is an objective one and evaluates whether probable cause existed on the facts as they appeared to a reasonable police officer, even if the reasonable belief of that officer is ultimately found to be incorrect."). "Often termed as 'arguable probable cause', qualified immunity . . . [even] protects officers who reasonably but mistakenly believe that probable cause exists." *Abbott*, 705 F.3d at 714 (internal citation omitted).

Here, defendants argue that Officer Stelter not only had arguable but actual probable cause to arrest Johnson for disorderly conduct under Wis. Stat. § 947.01, which provides that it is a Class B misdemeanor to "engage[] in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct under circumstances in which the conduct tends to cause or provoke a disturbance." The court agrees based on the undisputed record before it, which reveals that Officer Stelter learned the following when he interviewed apartment manager Green at the scene:

- When Green arrived at the apartment building, she saw Johnson walking on his hands, which alarmed her because Johnson was not typically outside at this time of day.

- After entering her office, Green heard yelling from the apartment that Johnson shared with Sulureh, and Johnson then approached her office, yelling that Sulureh had to move out and Green needed to call the CARES team.

- When Green told Johnson that she was not going to call the CARES team on Sulureh, Johnson said that he saw who she was, she did not know who she was messing with, and he knew she was with "them."

27

- After Johnson returned to his apartment, Green heard yelling and banging, after which Johnson exited again, with his hoodie up and tightened around his face, and paced in the courtyard area while pointing down the road and yelling statements, including: "Today is the day, bitch. I'm going to get a mother fucker today. Where you coward mother fuckers at? I'm going to kill you."

- After Johnson again returned to his apartment, Green heard more yelling and a baby crying. She also observed plaintiffs' older children looking out the window.

- When Johnson again came out of the apartment, this time carrying a baby, he approached Green's office door, yelling that she was after him and was working with "them."

- Green felt personally threatened because Johnson made a comment about getting her with a scary, blank stare.

While plaintiffs vehemently disagree with aspects of Green's account, which they argue constitutes only unverified, third-party impressions, they do not dispute that Green *told* Officer Stelter all of these things, nor do they present any evidence from which a reasonable jury could conclude that Stelter had any reason to believe Green was being untruthful. *Sow v. Fortville Police Dept.*, 636 F.3d 293, 302 (7th Cir. 2011) ("When a third party provides an officer with information [supporting a criminal charge] and it seems reasonable to believe that person is telling the truth, the officer has probable cause to effectuate an arrest."); *Matthews*, 675 F.3d at 706-07 (officers have "probable cause" if a reasonably credible witness or victim informs them that someone has committed a crime; nor do they have a constitutional obligation to conduct further investigation in the hopes of uncovering potentially exculpatory evidence). Moreover, it is also undisputed that Sulureh *confirmed* to Officer Stelter at the scene that Johnson had some kind of argument with Green before the police arrived, as well as that Johnson and she had been yelling and swearing at one another.

Plaintiffs go to great lengths to establish that Johnson was calm and crying when Officer Stelter spoke with him and that he never threatened Sulureh in their presence. However,

28

neither of these things mean Johnson had not committed the offense of disorderly conduct before the officers arrived on scene. To the contrary, based on the information received from Green and Sulureh before he made the decision to arrest Johnson, with Sergeant Schwartz's consent, Officer Stelter had ample reason to conclude that Johnson had committed the offense of disorderly conduct *without* a domestic enhancer by acting erratically, yelling loudly both inside and outside the apartment building, *and* making not only vague threats to kill someone, but threatening to "get" Green personally, which is what prompted Green to call 911.[14]  *See, e.g., Menier v. Thompson*, 85 F.3d 631, 1996 WL 158328, at *2 (7th Cir. 1996) (unpublished) (yelling and swearing, and the lack of a justification to engage in that conduct, were factors supporting a disorderly conduct charge); *State v. Dowling*, 2016 WI App 88, ¶ 30, 372 Wis. 2d 459, 888 N.W.2d 247 (police had probable cause to arrest defendant for disorderly conduct where defendant had been "yelling sufficiently loud and for a sufficient length of time that one neighbor called the police and another neighbor came over to [his] apartment to try to calm him down"); *State v. Galarowicz*, 2013 WI App 13, ¶ 19 (yelling and swearing were factors supporting a disorderly conduct charge).  More specifically, considering the facts known to Officer Stelter at the time of Johnson's arrest, which can be imputed to the other officers and

---

[14] While "[s]peech alone may constitute disorderly conduct *only* if it falls within a category of speech outside the First Amendment's scope . . . [, a] true threat is an example of unprotected speech that can be the basis of a disorderly conduct charge."  *Oetzman v. Dodge Cnty., Wisconsin*, No. 24-cv-94-jdp, 2025 WL 3022571, at *3 (W.D. Wis. Oct. 29, 2025) (emphasis added) (citing *In re A.S.*, 2001 WI 48, ¶¶ 1, 16, 243 Wis. 2d 173, 626 N.W.2d 712; *In re Douglas D.*, 2001 WI 47, ¶ 32, 243 Wis. 2d 204, 626 N.W.2d 725).  Although some of Johnson's threats of violence seemed to be directed at others not present on the scene, Green made clear that Johnson stared at her directly while telling her that he was going to "get" her.  *Virginia v. Black*, 538 U.S. 343, 359-60 (2003) ("'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals," even if the speaker did not actually intend to carry out the threat.).

sergeants present at the scene,[15] a reasonable officer would have believed not only that Johnson had acted so erratically and yelled so loudly as to cause a disturbance, but that he had threatened Green. Stelter was also entitled to discount Johnson's denial of this behavior or any intent to harm Green. *Oetzman*, 2025 WL 3022571, at *3 (finding same); *see also Hebron v. Touhy*, 18 F.3d 421, 423 (7th Cir. 1994) ("Police have a hard time evaluating competing claims about motive; they are entitled to act on the basis of observable events and let courts resolve conflicts about mental states.").

In any event, because defendants have raised qualified immunity as a defense, plaintiffs have the burden of showing that Officer Stelter is not immune by citing controlling legal authority that clearly prohibits officers from arresting an individual for disorderly conduct when that individual exhibits the behaviors reported in this case. Plaintiffs have identified no such case, controlling or otherwise, in which a court has held in similar circumstances that an officer lacked probable cause to make such an arrest. Indeed, courts have actually found the opposite. *See Johnson v. Foryan*, No. 23-cv-762-jdp, 2025 WL 1019935, at *2 (W.D. Wis. Apr. 4, 2025) (finding at least arguable probable cause to arrest plaintiff for disorderly conduct where plaintiff was yelling and swearing at children and playing loud music in building where others resided and incident ended in 911 call). Accordingly, plaintiffs have failed to show that

---

[15] "There is no Fourth Amendment violation if the knowledge of the officer directing the stop, search, or arrest -- or the collective knowledge of the agency for which he works -- is sufficient to constitute probable cause." *United States v. Williams*, 627 F.3d 247, 252 (7th Cir. 2010); *see also United States v. Booker*, 579 F.3d 835, 839 (7th Cir. 2009) (knowledge of one officer can be imputed to another where police officers are communicating with one another). In addition, because the court has found that Officer Stelter did violate Johnson's constitutional rights, the other responding officers also cannot be liable under a failure-to-intervene theory. *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005) ("In order for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation.").

30

Johnson's seizure under the circumstances was objectively, beyond question, a violation of the Fourth Amendment. Therefore, even if Officer Stelter did not have probable cause to arrest Johnson for disorderly conduct, he and by extension, the other officers, are entitled to qualified immunity with respect to Johnson's false arrest claim.

## B. Malicious Prosecution

"To state a claim for malicious prosecution under section 1983, a plaintiff must demonstrate that: (1) he has satisfied the requirements of a state law cause of action for malicious prosecution; (2) the malicious prosecution was committed by state actors; and (3) he was deprived of liberty." *Reed v. City of Chicago*, 77 F.3d 1049, 1051 (7th Cir. 1996) (citing *Smart v. Board of Trustees of University of Illinois*, 34 F.3d 432, 434 (7th Cir. 1994)); *see also Thompson v. Clark*, 596 U.S. 36, 44 (2022) ("[M]alicious prosecution requires the plaintiff to show a favorable termination of the underlying criminal case against him."). In Wisconsin in particular, the tort of malicious prosecution requires the following six elements: (1) there must have been a prior institution or continuation of some regular judicial proceedings against plaintiff; (2) such former proceedings must have been by, or at the instance of, the defendant in this action for malicious prosecution; (3) the former proceedings must have terminated in favor of the defendant (now the plaintiff in the action for malicious prosecution); (4) there must have been *malice* in instituting the former proceedings; (5) there must have been want of probable cause for the institution of the former proceedings; and (6) there must have been injury or damage resulting to the plaintiff from the former proceedings. *Strid v. Converse*, 111 Wis. 2d 418, 423, 331 N.W.2d 350, 353 (1983); *Wisconsin Pub. Serv. Corp. v. Andrews*, 2009 WI App 30, ¶ 23, 316 Wis. 2d 734, 766 N.W.2d 232.

31

Johnson cannot satisfy the first element of a malicious prosecution claim under Wisconsin law because no judicial proceeding was instituted against him, as he was neither arrested pursuant to a judicially-issued warrant nor ever charged with a crime.  Moreover, while plaintiffs cite several cases to support their contention that the filing of charges or a formal court appearance are not required to bring a claim for malicious prosecution, none of those cases stand for this proposition.  *See Chiaverini v. City of Napolean*, 602 U.S. 556, 558 (2024) (To succeed on Fourth Amendment malicious-prosecution claim under 42 U.S.C. § 1983, "plaintiff must show that a government official *charged* him without probable cause.") (emphasis added); *Thompson*, 596 U.S. at 43 ("[T]he gravamen of the Fourth Amendment claim for malicious prosecution, as this Court has recognized it, is the wrongful *initiation of charges* without probable cause.") (emphasis added); *Manuel v. City of Joliet*, 580 U.S. 357, 367-68 and n.6 (2017) (distinguishing between pre-legal and post-legal process, noting further in dicta that an arrest warrant is a way of initiating legal process); *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (discussing plaintiff's substantive due process claim related to his "surrender to the State's show of authority" in form of arrest warrant).  Finally, at least in the context of the Sixth Amendment right to counsel, the Supreme Court has discussed the "initiation of adversary judicial criminal proceedings" as commencing with a "formal charge, preliminary hearing, indictment, information, or arraignment."  *Rothgery v. Gillespie Cnty., Tex.*, 554 U.S. 191, 198 (2008).  Regardless, since the court has concluded that there *was* probable cause for Johnson's arrest, the officers have an absolute defense to a claim for malicious prosecution.  *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006); *Brueggen v. Baudek*, No. 26-cv-235-jdp, 2026 WL 1383276, at *2 (W.D. Wis. May 18, 2026).  Accordingly, defendants are entitled to summary judgment on this claim as well.

32

## C.  Excessive Force

Johnson also claims that Officer Stelter used excessive force during his arrest on August 19, 2022, by grabbing Johnson's arm, contorting his wrists and arms behind his back, handcuffing him too tightly, and applying pressure to his shoulder and collar bone areas.  Under the Fourth Amendment's protection against unreasonable seizures, "[a] person has the right to be free from an officer's knowing use of handcuffs in a way that would inflict unnecessary pain or injury, if that person presents little or no risk of flight or threat of injury."  *Rooni v. Biser*, 742 F.3d 737, 742 (7th Cir. 2014) (citing *Stainback v. Dixon*, 569 F.3d 767, 772 (7th Cir. 2009); *Payne*, 337 F.3d at 778).  "The question, however, is whether the officer knows that he is inflicting such pain.  An officer cannot be expected to respond to an injury about which he is unaware.  Nonetheless, knowledge may be inferred 'from the nature of the act itself.'"  *Id*. at 742-43 (citing *Stainback*, 569 F.3d at 772).  "In other cases, it may become clear to an arresting officer that, although a particular action would not ordinarily harm an arrestee, the action would nevertheless cause pain or injury to the particular individual being placed under arrest.  For example, an officer's otherwise reasonable conduct may be objectively unreasonable when the officer knows of an arrestee's medical problems."  *Stainback*, 569 F.3d at 772; *see also Rabin v. Flynn*, 725 F.3d 628, 636 (7th Cir. 2013) (circumstances relevant to reasonableness assessment include an officer's knowledge of preexisting injury or medical condition that would have been aggravated by handcuffing and complaints by suspect about his pain).

Here, there is *no* evidence that Johnson ever complained about the position of his wrists or arms, the tightness of his handcuffs, or the grip on his shoulder area, much less the pain these actions caused.  *See Sow,* 636 F.3d at 304 (Fact that plaintiff complained once that the handcuffs were too tight without any "elaboration" and did not complain of or receive

33

treatment for any injury when he was taken to jail are "not sufficient to establish a genuine issue of material fact regarding whether [officer] used excessive force."); *Tibbs v. City of Chicago*, 469 F.3d 661, 666 (7th Cir. 2006) (no excessive force where plaintiff complained only once that handcuffs were too tight, but did not tell officers the degree of his pain, experienced only minimal injury, and did not seek medical care).  In fact, as defendants point out, Officer Stelter's Arbitrator video recording, which started as soon as Johnson was placed in the squad car at approximately 11:29 a.m., confirms that Johnson was not in any visible distress, nor making any complaints about his handcuffs or pain.  Similarly, upon Johnson's arrival to the jail at 12:23 p.m., he can be seen maneuvering his hands easily from the back to front by stepping over his handcuffed wrists, then moving them to the back again when Officer Stelter requested that he do so, all without complaining about the supposed tightness of his handcuffs or the position of his arms or wrists.  While plaintiffs argue in their response brief that Johnson was actually in pain but afraid to say anything, the only admissible evidence they provide is Johnson's declaration, which is silent on this issue.  Further, the video and audio recordings belie such a claim.

In any event, law enforcement officers are entitled to qualified immunity in Fourth Amendment excessive force cases "unless existing precedent squarely governs the specific facts at issue."  *Cibulka v. City of Madison*, 992 F.3d 633, 639 (7th Cir. 2021).  And to overcome qualified immunity in an excessive-force case, plaintiff must either: (1) identify a closely analogous case that established a right to be free from the type of force the police officers used; or (2) show that the force was so plainly excessive that, as an objective matter, the police officers would have been on notice that they were violating the Fourth Amendment.  *Id*.

34

Here, plaintiffs fail to even address the defense of qualified immunity as it relates to Johnson's claim of excessive force, apart from arguing that "the Seventh Circuit has repeatedly held that painful restraint techniques, forceful twisting, and excessively tight handcuffs *may* be found unreasonable." (Dkt. #94, at 37-38.) However, this general legal pronouncement by itself is arguably insufficient to govern the outcome of this specific case. In particular, such a reading would run headlong into the Supreme Court's repeated warning "not to define clearly established law at too high a level of generality" for purposes of a qualified immunity analysis. *E.g., Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 2 (2021). Thus, the Seventh Circuit has specifically held that "framing the right" in the excessive force context "as the right to be free from force once subdued is impermissibly broad." *Brumitt v. Smith*, 102 F.4th 444, 448 (7th Cir. 2024); *see also Manery v. Lee*, 124 F.4th 1073, 1079 (7th Cir. 2025) (holding that framing constitutional right as "deadly force cannot be used when there is no longer an imminent threat of danger" is "too high a level of generality"). "Because the inquiry into whether an officer used excessive force is highly fact-dependent, police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Manery*, 124 F.4th at 1081 (citation omitted). Plaintiffs have simply failed to identify any such precedent, nor does the existing precedent discussed above support plaintiffs' argument.

For these reasons, Officer Stelter is entitled to summary judgment with respect to Johnson's excessive force claim against him. By extension, Johnson also cannot prevail on his claim (*see* dkt. #87, at ¶ 6 and #94, at 21) that the officers who observed Officer Stelter's use

35

of force when they surrounded him are liable under a failure-to-intervene theory.[16] *Harper*, 400 F.3d at 1064.

### D.  Racial Profiling

Plaintiffs next claim that the officers' actions on August 19, 2022, were motivated by Johnson's race, in violation of his right of equal protection.  *See Sow*, 636 F.3d at 303 ("Racial profiling, or selective enforcement of the law, is a violation of the Equal Protection Clause.")  However, to survive summary judgment on this claim, plaintiffs must present *evidence* that Officer Stelter and the other officers present were "motivated by a discriminatory purpose," *id*. (internal citations omitted), by establishing that the officers "treated him differently than persons of a different race and that [they] did so purposefully."  *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000), *abrogated on other grounds by Savory v. Cannon*, 947 F.3d 409 (7th Cir. 2020).

At most here, plaintiffs note in support of this claim that Officer Main, who is not a defendant, refused to investigate Johnson's claim of race discrimination against an unidentified neighbor on August 18, 2022, arguing that this "enforcement asymmetry -- who was policed, who was ignored, and how discretion was exercised -- is evidence" of defendants' discriminatory purpose.  (Dkt. #94 at 27.)  Even if Officer Main refused to investigate plaintiffs' earlier reports that their neighbors were harassing them based on their race, however, the current record before the court would not permit a reasonable jury to find that any of the defendants in this case

---

[16] Plaintiffs do not argue that these defendants also themselves exercised excessive force by drawing their weapons, but even if they had, pointing a gun as part of an arrest is not by itself unreasonable. *See Wilkins v. May*, 872 F.2d 190, 194 (7th Cir. 1989) ("Where the officer merely points a gun at a suspect in the course of arresting him, the suspect would have no basis for claiming that he had been seized with excessive force in violation of the Constitution.").

even knew about, much less were involved in, plaintiffs' earlier call for service nor Officer

Main's response on August 18, 2022. As such, plaintiffs' reference to an unrelated incident

involving another officer on a different day falls well short of the evidence needed to prove the

officers in this case treated Johnson differently than *they* treated others of a different race, much

less that they acted purposefully. Accordingly, defendants are also entitled to summary

judgment on this claim.

### III. June 14, 2023

Plaintiffs assert that defendants Hernke, Ciufo, Schroeckenthaler, Loredo, and Hall

violated the Fourth Amendment when they detained Johnson and Sulureh in handcuffs and

searched their apartment without a legal basis on June 14, 2023.[17]

#### A. Detention

While seizures are reasonable only when they are based on probable cause, an officer

may briefly detain someone for investigatory purposes if the detention is supported by the less

stringent standard of reasonable suspicion. *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968); *Rabin v.

Flynn*, 725 F.3d 628, 632 (7th Cir. 2013). An investigative stop under *Terry*, is "a brief

detention which gives officers a chance to verify (or dispel) well-founded suspicions that a

person has been, is, or is about to be engaged in criminal activity." *United States v. Boden*, 854

F.2d 983, 992 (7th Cir. 1988). To justify this limited detention, the officer "must be able to

point to specific and articulable facts which, taken together with rational inferences from those

facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21 (footnote omitted); *Ornelas v.*

---

[17] Given Sulureh's consent, plaintiffs do not challenge defendants' search of their vehicle.

*United States*, 517 U.S. 690, 696 (1996) (describing reasonable suspicion "simply as 'a particularized and objective basis' for suspecting the person stopped of criminal activity") (citation omitted).

However, if an investigatory stop continues for too long or becomes unreasonably intrusive, including through a disproportionate use of force, then it can turn into a de facto arrest, which requires a finding of probable cause. *United States v. Olson*, 41 F.4th 792, 799 (7th Cir. 2022); *United States v. Bullock*, 632 F.3d 1004, 1015-16 (7th Cir. 2011). Handcuffing, drawing weapons,[18] and other measures of force traditionally associated with arrest may also be proper during an investigatory detention, depending on the circumstances, which may include ensuring the safety of the officers or others. *Matz v. Klotka*, 769 F.3d 517, 525 (7th Cir. 2014) (officers did not exceed scope of permissible *Terry* stop by drawing weapons and handcuffing driver until police were able to determine whether vehicle was stolen); *see also Bullock*, 632 F.3d at 1016 ("Given that officers were conducting a search for drugs, it was reasonable to place Bullock in handcuffs and in the squad car for their safety while they pursued their investigation," even though officers had patted down Bullock and did not discover any weapons.); *United States v. Smith*, 3 F.3d 1088, 1094 (7th Cir. 1993) (handcuffing of a suspect without probable cause to arrest is not unlawful per se). Defendants contend that this was one of those circumstances.

As with probable cause, reasonable suspicion is determined in light of the totality of the circumstances known to the officers at the time of the detention. Specifically, "[i]n evaluating the reasonableness of an investigatory stop, [the court] examine[s] whether the 'officer's action

---

[18] As discussed above, plaintiffs assert in their briefs that the officers had their guns drawn when they detained plaintiffs, but the only evidence they cite in support of this assertion are their declarations, which do not establish this fact.

was justified at its inception' and 'whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Rabin*, 725 F.3d at 632. In this case, it is undisputed that all of the officers and sergeants who responded to the scene heard the 911 dispatch and subsequent alert tones regarding a black male, wearing no shirt and black jogging pants, who had reportedly "flashed a gun" at a woman with children present. After arriving on scene, Officers Ciufo and Cripe also noted that the address was in the midst of several apartment buildings with multiple surrounding units and children outside. They then observed a black male (Johnson) who matched the description given by dispatch.

To determine what was going on, Officer Ciufo then spoke with Johnson and the woman who had called 911, Malajsia Birchette. And even though *Johnson* told Officer Ciufo that nobody had a gun, Birchette again told Ciufo that Johnson had flashed a gun at her after a verbal argument before putting it in a book bag that he brought into his apartment. At approximately 7:45 p.m., Officer Ciufo told Johnson and Sulureh, who had by then arrived on scene after grocery shopping, that both would be detained while the officers investigated the report of a gun. At Officer Ciufo's direction, Officer Schroeckenthaler, who arrived as Officer Ciufo were talking with Johnson and Sulureh, then detained Johnson and Sulureh in handcuffs and sat them on the ground. While plaintiffs would dispute, without any corroborating evidence, defendants' claims that Sulureh's handcuffs were removed after nine minutes and Johnson's were removed after 15 minutes, it is undisputed that plaintiffs were both released from further detention at 8:13 p.m., after the officers had completed the searches of plaintiffs' apartment and car, which would mean that Johnson and Sulureh were in handcuffs for no more than 28 minutes.

39

Given that the officers were searching for a gun in a densely populated area with children present, it was reasonable to detain both for that period in time while officers pursued their investigation, even though the officers did not find a weapon. *See Bullock*, 632 F.3d at 1015 (finding defendants were reasonably detained 30-40 minutes while officers diligently investigated reports of drugs). Indeed, Birchette had made clear to Officer Ciufo that Johnson threatened her with a gun, which he placed in a book bag before returning to the apartment he shared with Sulureh. *Gut v. City of Wausau*, 592 F. Supp. 3d 777, 786 (W.D. Wis. 2022) ("[O]fficers have a significant interest in securing the premises if weapons are likely to be present."). Even though bystanders, who refused to identify themselves, subsequently told Officer Hernke that they did not see any gun or weapon displayed during the verbal altercation with Birchette, this alone was not enough to dispel the officers' reasonable suspicion that a weapon might nonetheless be present, especially when one of the suspects (Suruleh) acknowledged being in a loud domestic dispute with the other suspect (Johnson) shortly before. *Id*. at 787 ("[W]hen officers confront behavior that could be innocent or criminal, they are allowed to detain the suspect to resolve the ambiguity.") (citing *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)). Regardless, the overwhelming evidence supports a finding that the officers acted diligently and quickly in investigating Birchette's report by searching the apartment, and when Birchette subsequently reported seeing Johnson hand Sulureh a bag to place in her car, conducting a brief search of Sulureh's car with her consent. In light of everything the officers knew at the time, a reasonable jury would have to find an objective officer would have to detain plaintiffs while dispelling their concerns about the presence of a gun. *Id*.; *see also Rabin*, 725 F.3d at 635 ([G]iven the safety risks at stake, it was reasonable under clearly established law

for the officers to temporarily detain Rabin [for one and a half hours] pending the verification of his gun carrying license.")

Finally, as with their other claims, plaintiffs fail to identify any case that *clearly* prohibits officers from detaining an individual under similar circumstances.  Indeed, as discussed above, courts have actually found the opposite.  Accordingly, plaintiffs have failed to offer evidence or law establishing their detention was objectively and beyond question a violation of the Fourth Amendment.  Therefore, even if Officer Ciufo lacked either probable cause or reasonable suspicion to detain plaintiffs, he is (and by extension, the other officers are) entitled to qualified immunity with respect to plaintiffs' claim of unreasonable seizure on June 14, 2023.

### B.  Apartment Entry and Search

While warrantless entries and searches within a home are considered presumptively unreasonable and a violation of the Fourth Amendment, defendants argue that both Sulureh's consent and exigent circumstances justified the officers' entry into plaintiffs' apartment to perform a protective sweep under two, independently recognized exceptions to the warrant requirement.[19] *See United States v. Huddleston*, 593 F.3d 596, 600 (7th Cir. 2010) (citing *United States v. Bell*, 500 F.3d 609, 612 (7th Cir. 2007) (Warrantless entries and searches are "constitutionally permissible 'under certain narrowly proscribed exceptions,' including where exigent circumstances require officers to 'step in to prevent serious injury and restore order.'").

---

[19] While defendants argue that the "community caretaker doctrine" also justified their conduct, the Seventh Circuit has limited this exception to automobile searches, *Sutterfield*, 751 F.3d at 555, so the court does not consider it in this case.

### 1. Consent

When someone with authority or who is reasonably believed to share authority over the area consents to entry, either verbally or non-verbally, there is no Fourth Amendment violation, provided that the consent is voluntary and not the product of duress or coercion, which is a question of fact to be determined by the totality of the circumstances. *Bell*, 500 F.3d at 612-13; *United States v. Walls*, 225 F.3d 858, 862-63 (7th Cir. 2000) (homeowner consented to warrantless entry by opening the door and stepping back to allow officers to enter). In this case, the undisputed facts show that: (1) within a minute of plaintiffs' initial refusal to consent to the officers' entry of their home, Sulureh volunteered that the officers *could* enter the apartment to check on their children, as long as she went with them; (2) Johnson did not raise any further objection to Sulureh accompanying the officers into the apartment; and (3) Sulureh was present and does not claim that she objected to the officers opening her apartment door.

Nevertheless, plaintiffs argue that Sulureh's consent was insufficient because Johnson, as a co-tenant of the apartment, never consented to their search. *See Georgia v. Randolph*, 547 U.S. 103, 122-23 (2006) ("[A] physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant."). Even though Johnson did not affirmatively revoke his previous denial of consent, it is undisputed that Johnson was present when Sulureh agreed to allow the officers to search the apartment, and that he then failed to raise any further objection to her offer to accompany the officers inside the apartment to check on her children. On this record, a reasonable jury could only conclude that the officers had Sulureh's consent to enter the apartment, which Johnson did not expressly refuse.

42

Plaintiffs also contend that Sulureh's consent was coerced, since she consented only after officers leveraged Sulureh's concern for her children inside the apartment, then exceeded the bounds of her coerced permission by unreasonably searching after her children were located. However, there is *no* evidence in the record from which a reasonable trier of fact could find that Sulureh's consent was the product of duress or coercion. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 229 (1973) ("In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents."); *United States v. Correa*, 908 F.3d 208, 222 (7th Cir. 2018) (factors relevant to coercion include: (1) age, intelligence, and education of the person who gave consent; (2) whether she was advised of her constitutional rights; (3) how long she was detained before consenting; (4) whether she consented immediately or only after repeated requests by authorities; (5) whether physical coercion was used; and (6) whether she was in police custody at the time she gave her consent). First, before consenting to the search, Sulureh had only been detained in handcuffs for approximately six minutes. Second, both she and Johnson were aware of their right to refuse consent, which they initially invoked. Third, after her initial refusal, Sulureh almost immediately offered her consent to officers entering the apartment on the condition that she be allowed to go with them, which the officers allowed her to do. In the absence of any evidence of repeated requests from or pressure to consent by the officers, subtly coercive questions, physical threats, Sulureh's confusion as to her legal rights, or any other obviously-coercive measure, no reasonable trier of fact would find that the officers entered plaintiffs' home without consent in violation of the Fourth Amendment. *See Walls*, 225 F.3d at 862; *Cooper v. Pionke*, No. 12-cv-555-wmc, 2015 WL 1781721, at *4 (W.D. Wis. Apr. 20, 2015) (finding same where

43

plaintiff opened door to uniformed officer he had met a week prior and did not object when officer asked to come in).

Finally, even if plaintiffs' initial refusal to consent to entry were found controlling, despite Sulureh's subsequent verbal consent and Johnson's arguable acquiescence by silence, plaintiffs offer no case holding the same on similar facts, much less a controlling case by the U.S. Supreme Court or the Seventh Circuit.  Nor is this court aware of any such opinion. Accordingly, defendants are at least entitled to qualified immunity for believing they had consent to enter the apartment.

### 2.  Exigent Circumstances

In addition, exigent circumstances exist when there is a pressing and immediate need for law enforcement to enter a home, but no time to secure a warrant.  *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 557 (7th Cir. 2014).  For example, recognized exigencies include an immediate threat to the safety of a person in the residence or a danger posed to others by the occupant of a dwelling, as when the occupant is armed and might shoot at the police or others. *Id*. (collecting cases); *see also Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (need to protect or preserve life or avoid serious injury is justification for otherwise illegal entry); *Russell v. Comstock*, 167 F.4th 984, 990 (7th Cir. 2026) (citing *Brigham* for same); *Huddleston*, 593 F.3d at 600 (Exigent circumstances exist "where police reasonably believe that their safety, or the safety of the public, may be threatened.").  A subset to this exception is the "emergency aid doctrine," which recognizes that a warrantless entry into the home may be appropriate when police enter for an urgent purpose other than to arrest a suspect or to look for evidence of a crime.  *Brigham*, 547 U.S. at 403-04; *Sutterfield*, 751 F.3d at 557.

44

Whether the exigent circumstances exception and the related emergency aid doctrine justify a warrantless entry is judged by an objective standards, with courting ask whether the officers reasonably believed, based on the facts known to them at the time, that there was a compelling need to enter the home without first obtaining a warrant in order to render assistance or prevent harm to persons within the home. *Sutterfield*, 751 F.3d at 557. Here, defendants had an objective basis after Birchette's report to believe that Johnson or Sulureh brought a gun back into their apartment where his very young children still remained without any adult supervision. Thus, the officers had objective grounds to act quickly and enter plaintiffs' apartment only 10 minutes after learning from Birchette that Johnson may have brought a gun into an apartment with only young children present. While plaintiffs and other people at the scene denied that there was a gun, the officers were not required to believe without question others' versions of the events once Birchette provided a credible reason to suspect the children may be in harms way. *Russell*, 167 F.4th at 991 (finding similar). Under such circumstances, a reasonable trier of fact would have to find that the officers had ample reason to believe that they did not have time to get a warrant because the young children inside the apartment might harm themselves or others with a potentially loaded weapon.

As to the scope of the search, its reasonableness under the emergency aid exception is determined in light of the exigency. *Russell*, 167 F.4th at 994; *see also Maryland v. Buie*, 494 U.S. 325, 327 (1990) (describing protective sweep incident arrest to protect safety as quick, limited, and cursory). Here, the defendants conducted a brief, one-minute search of plaintiffs' apartment, which is consistent with a search limited to locating the three children present and ensuring a gun was not left in plain sight. *See Sutterfield*, 751 F.3d at 557 (finding exigent circumstances justified officers' entry and protective sweep of woman's home after her doctor

45

reported she was suicidal, stated she might shoot herself, and owned a gun).  As discussed above, plaintiffs fail to present any evidence that the officers' sweep of their apartment exceeded this permissible scope or was otherwise unreasonable.

Finally, at the very least, defendants are entitled to qualified immunity for their actions in entering plaintiffs' apartment and conducting a protective sweep for a gun.  Again, plaintiffs have failed to meet their burden of showing through clearly-established, controlling legal precedent that any reasonable officer in defendants' shoes would have understood that they were violating plaintiffs' Fourth Amendment rights in entering the apartment and proceeding with their search.  *Villalobos v. Picicco*, 168 F.4th 1057, 1064 (7th Cir. 2026); *Russell*, 167 F.3d at 994; *Cibulka*, 992 F.3d at 638.  Indeed, the court finds that any objective officer possessing the same knowledge in similar circumstances would reasonably believe that the entry and sweep of the apartment fell within both of the exceptions to the Fourth Amendment's warrant requirement discussed above.

## IV.  State Law Claims

Finally, plaintiffs assert civil assault and battery claims against defendants Stelter, Goodchild, Schwarz, Dornan, Wild, Thompson, and Barnes under Wisconsin law for their alleged conduct during the August 2022 incident.  While the court has supplemental jurisdiction over these claims under 28 U.S.C. § 1367(a), which permits a federal district court to hear state-law claims if related to a federal claim in the same action, plaintiffs fail to assert any other basis for federal jurisdiction over these state-law claims, including diversity jurisdiction given that both plaintiffs and defendants are Wisconsin citizens.  Absent unusual circumstances, when all federal claims have been dismissed before trial as here, the general

practice in federal court is to decline to exercise supplemental jurisdiction over the related state-law claims. *See Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 352 (7th Cir. 2019). Because neither party identifies any unusual circumstances that would justify retaining jurisdiction over plaintiffs' state-law claims, the court will decline to exercise subject matter jurisdiction without evaluating the merits.

Even so, plaintiffs may still pursue their civil assault and battery claims in state court, subject to applicable statutes of limitations or any other procedural bars. While those limitations periods may have been tolled during the period that this case has been pending, they will begin to run again within 30 days from the date of this order. *See* 28 U.S.C. § 1367(d) ("The period of limitations for any claim asserted under [the court's supplemental jurisdiction] . . . shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period."). Accordingly, plaintiffs will need to proceed in state court sooner rather than later.

ORDER

IT IS ORDERED that:

1) Defendants Unidentified Federal Officers are DISMISSED.

2) The motion for summary judgment filed by defendants City of Madison and its officers (dkt. #67) is GRANTED as to plaintiff's federal claims.

3) Plaintiffs' motion for partial summary judgment (dkt. #86) is DENIED.

4) Plaintiffs' state-law claims are DISMISSED WITHOUT PREJUDICE under 28 U.S.C. § 1367(c)(3).

5)  The clerk of court is directed to enter judgment accordingly and close this case.

Entered this 8th day of July, 2026.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge